IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RODNEY L.  DONELSON,                    )
                                        )
            Petitioner,                 )
                                        )
      v.                                )          Case No.  4:16-cv-00637-AGF
                                        )
TROY STEELE,                            )
                                        )
            Respondent.                 )

## MEMORANDUM AND ORDER

This matter is before the Court on the pro se petition of Missouri state prisoner Rodney L. Donelson for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  On May 6, 2010, Petitioner was convicted by a jury of two counts of first-degree murder.[1] Petitioner was sentenced to consecutive terms of life imprisonment without parole.

In his federal habeas petition, Petitioner raises several claims of ineffective assistance of counsel, as well as a claim of judicial misconduct.    For the reasons set forth below, habeas relief will be denied.

## BACKGROUND

### Pre-Trial

The charges against Petitioner stemmed from two homicides, the first of Cassandra Scott in July 2000, and the second of Barbara Hampton in September 2005. Prior to trial, Petitioner's trial counsel filed a motion to sever, which was heard by the

---

[1]      Petitioner was also convicted of two counts of armed criminal action, but those convictions were reversed on direct appeal as barred by the statute of limitations.

trial court on April 20, 2010.   Trial counsel argued that the State had not made the

requisite showing for joining the murder charges, including any similarity in motive or

character, or any common scheme or plan.

The State argued that joinder was proper because there were several similarities

between the two homicides.   A detective involved in the investigations of both

homicides testified as to these similarities, including that both victims were black females

that knew Petitioner; both homicides took place in the victims' apartments, which were

located only about a mile apart; Petitioner's brother lived in the same apartment building

as Scott, and Petitioner lived in the same apartment building as Hampton; Petitioner's

DNA was found at both crime scenes; a telephone cord was found at both crime scenes,

five feet away from Scott's body and underneath Hampton's body; a kitchen knife was

found at both crimes scenes, still stuck in Scott's body and on a bed near Hampton's

body; a bottle labeled as antifreeze but filled with water was found near Scott's body, and

it appeared that blood on her body may have been diluted with some liquid, and

Hampton's body was covered in several liquids and powders, with bottles of dish and

laundry detergent nearby; an empty bottle of rubbing alcohol was found at both crime

scenes; and Scott died by stabbing in the neck, as well as strangulation via a purse strap

around the neck, and Hampton died of suffocation by a gag in her mouth and sustained a

tear or laceration to her vaginal area.

Through cross examination of the detective, Petitioner's trial counsel highlighted

the differences between the crimes, including that the murders took place five years apart;

there was no indication that the telephone cord had any connection to Scott's homicide;

there was no indication that any cleaning fluid had been poured on Scott's body as it had

on Hampton's; and Scott was stabbed violently in the neck, with the knife still stuck in

her neck and a "huge pool of blood" surrounding her, whereas Hampton was not stabbed

but found gagged on the floor, and the knife in her case was found at least some distance

away on the bed. Trial counsel also argued that the prejudice arising from joining the

murder charges "would be incredibly overwhelming," particularly because the State's

evidence against Petitioner in the Scott case, standing alone, was relatively weak. Resp.

Ex. A at 8.

The trial court determined that the State had made a sufficient showing justifying

joinder and denied trial counsel's motion. Trial began on May 3, 2010. On that date,

defense counsel withdrew her motion to sever. Resp. Ex. B at 39.

**Trial**

Evidence at Trial

The evidence at trial showed the following, as summarized by the Missouri Court

of Appeals in Petitioner's direct appeal:

In July 2000, Cassandra Scott (Scott) was found dead in her apartment.[2] She
was lying face down on the floor in a pool of blood and with a kitchen knife
protruding from the back of her neck. A container of antifreeze, a telephone
cord, and a pair of men's underwear were found nearby. A purse strap was
wrapped around Scott's neck and arm. The murderer had apparently broken
a window on the front door to gain entry into Scott's apartment. Investigators
discovered that the blood near Scott's body had been diluted by some other
liquid and that the liquid was on Scott's buttocks. Investigators found an

---

[2] Scott was found by her boyfriend, Ronald Dickens, who testified at trial. Dickens
testified that he had been previously convicted of assault for hitting Scott after
questioning her about infidelity. He also admitted on cross-examination that he had
"used a knife to scare" Scott in the past. Resp. Ex. A. at 44, 46.

empty bottle of isopropyl alcohol in the apartment, and the knife found in Scott's neck matched some knives in the kitchen sink. An autopsy revealed that Scott died from a combination of strangulation by the purse strap and five cuts to the right side of her neck, which pierced the jugular vein. Laboratory testing on the men's underwear found near Scott's body revealed that two stains on the underwear were blood and seminal fluid. DNA tests matched the blood to Scott and the seminal fluid to [Petitioner].

[Petitioner] worked at the daycare where Scott worked, and [Petitioner]'s brother lived in the apartment below Scott's apartment. Although police investigators questioned [Petitioner] about Scott's death approximately two months after her body was found, [Petitioner] stated that he did not know anything about the murder. However, [Petitioner] told investigators that he had been in Scott's apartment to repair a VCR three days prior to her murder. [Petitioner] told investigators that he might have left a bag of clothes in Scott's apartment, including a pair of white boxer shorts. [Petitioner] claimed that he left the clothes there because he liked to flirt with women at the daycare center and he wanted to look clean. [Petitioner] then changed his story and said that he had been in Scott's apartment on the night of her murder and that they were preparing to engage in sex when they heard a car door slam. Scott suspected her boyfriend was there, so [Petitioner] gathered his clothes, ran down the rear stairs into his brother's apartment, and left the building. [Petitioner]'s brother, however, denied that [Petitioner] was in his apartment on the night of the murder.[3] When investigators confronted [Petitioner] with his brother's denial about [Petitioner]'s whereabouts, [Petitioner] subsequently changed his story again and claimed he had been at Scott's apartment to repair a VCR.

In September 2005, [Petitioner] was living in an apartment above the apartment of Barbara Hampton (Hampton). On September 14, 2005, at approximately 10:40 p.m., Hampton was having a telephone conversation with her daughter [Minnie Fuqua]. Hampton interrupted the conversation to answer a knock at the door, then told her daughter that [Petitioner] was there and wanted to use Hampton's telephone to make a call. Hampton ended the call with her daughter.

The following day, Hampton was found dead in her apartment.[4] She was lying on the bedroom floor with a gag tied around her mouth. Hampton's

---

[3]     When his brother asked Petitioner why he lied, Petitioner told his brother that the police "told him to say that." Resp. Ex. A at 53.

[4]     Hampton was found by her boyfriend, James Foster, Jr., who also testified at trial.

dress and slip were pushed up, and her underwear had been removed and left near her feet. Hampton had sustained an injury to her vaginal area. Several bottles were located near Hampton's body: dish washing liquid, laundry detergent, and an empty bottle of isopropyl alcohol. Near Hampton's body, police investigators found the cap from the bottle of isopropyl alcohol, dried liquids and powders, a kitchen knife, and a telephone cord. An autopsy revealed that Hampton died from suffocation caused by the gag pushing her tongue back so that it blocked her airway. The autopsy also showed that Hampton had sustained a fresh injury to her vaginal area that could have been caused by a sharp object or by something stretching the tissue. Blood was found on Hampton's slip, on a pillowcase, and on the cap from the bottle of isopropyl alcohol. DNA tests revealed that [Petitioner] was the source of the majority of DNA found in the blood on the bottle cap. [Petitioner]'s DNA also was found in some of the blood stains on the pillowcase. Trace amounts of DNA consistent with [Petitioner]'s DNA was found on [the] telephone cord and on Hampton's slip.

Police investigators questioned [Petitioner] about Hampton's death approximately one month after her body was found. [Petitioner] told investigators that he had spoken with Hampton the night before her body was found but that he had left with a friend named Robert Ellis (Ellis) and did not return home until the next morning. Ellis, however, denied that [Petitioner] had ever spent the night with him and specifically denied that [Petitioner] had spent the night with him in September 2005.[5]

Consequently, after further investigation, police questioned [Petitioner] a second time. This time, [Petitioner] admitted that he had lied in his first statement because he had spent the night with Brenda Jacobs (Jacobs) and he did not want his girlfriend, Melinda Freeman (Freeman), to know he had been cheating on her. [Petitioner] became angry and agitated during the second interview with police. [Petitioner] then admitted he had been in Hampton's apartment a few years earlier to help her husband carry in a mattress. Hampton's husband had died approximately two years before Hampton's murder. After [Petitioner] was arrested and informed of his *Miranda*[6] rights, [Petitioner] repeated the story he had given to investigators during the second interview.

---

[5]    However, Ellis also testified that Petitioner came over to his house "basically every day" in September of 2005, and would stay for several hours, sometimes until 11:00 p.m. Resp. Ex. A at 81.

[6]    *Miranda v. Arizona,* 384 U.S. 436 (1966).

Police investigators then questioned Freeman, with whom [Petitioner] had lived in the apartment above Hampton's apartment. Freeman provided investigators with Jacobs' telephone number. She stated that [Petitioner] had instructed her to tell police that he had been cheating on her with Jacobs. Investigators subsequently interviewed Jacobs, who stated that she and [Petitioner] had not spent any night together in September 2005.

After his arrest, [Petitioner] also discussed Scott's murder with police investigators. [Petitioner] claimed that he had gone to Scott's apartment the day before her murder to repair the toilet. [Petitioner] said that he must have left a bag of clothes in Scott's apartment; however, on the night of Scott's murder, he had stayed with his girlfriend, Latoya Vanderford.

*State v. Donelson*, 343 S.W.3d 729, 731–33 (Mo. Ct. App. 2011).

In presenting the DNA evidence from the Scott crime scene, the State relied in part on the testimony from an analyst from the St. Louis Metropolitan Police Crime Laboratory. The analyst stated that she compared DNA samples taken from the crime scene to DNA obtained from a buccal swab taken from the inside of Petitioner's mouth. Resp. Ex. A at 60-61.

In presenting the DNA evidence from the Hampton crime scene, the State relied in part on the testimony of an analyst from the St. Louis Metropolitan Police Department and another analyst from the Missouri State Highway Patrol, who conducted additional testing with respect to the samples containing only trace amounts of DNA. The police department analyst testified that she compared the DNA samples taken from the crime scene to a known DNA profile of Petitioner and determined to a reasonable degree of scientific certainty that Petitioner was the source of the major contributor of the DNA detected in samples taken from the bottle cap and a pillowcase. *Id.* at 86-87. She

testified that she sent the DNA samples from the telephone cord and Hampton's slip to the Missouri State Highway Patrol for further testing.

The State Highway Patrol analyst testified that she, too, compared the DNA samples from the Hampton crime scene to a known profile of Petitioner. She further testified that, according to her testing, the DNA samples taken from the telephone cord found underneath Hampton's body and from Hampton's slip were consistent with Petitioner's DNA. But she added that, in terms of statistical analysis, "[t]his haplotype was found 0 times in 3,271 black individuals and 5 times in 3,912 Caucasian individuals. Applying the frequency of this profile at approximately 1 in every 1,007 total individuals, 1 in every 1,093 black individuals and 1 in every 417 Caucasian individuals."[7] *Id.* at 90. On cross examination by Petitioner's trial counsel, the same analyst also acknowledged that an initial lab report indicated that the DNA samples from the Hampton crime scene matched a Rodney "Donaldson." The analyst then stated that she amended the report to correct the "misspelling" of the name. Resp. Ex. A at 91.

In closing argument, Petitioner's trial counsel argued that "nobody bothered to confirm that the DNA they got in the second case, in Ms. Hampton's case, was the same as they got in the first case. Nobody compared Rodney Donaldson's DNA to Rodney Donelson's DNA. D-O-N-E-L-S-O-N, not D-O-N-A-L-D-S-O-N." *Id.* at 102. She then referred to the statistical analysis of the DNA sample in Hampton's case and argued that "[t]hat DNA is more common by twice in white people than black people. Does that

_____

[7]     Petitioner is African-American.

7

mean definitively that this Rodney Donaldson is white? No. But think, think about it."
*Id.* at 102-03.

<u>Juror Walker</u>

On the first day of trial, shortly after a lunch break and after several witnesses for the State had testified, Petitioner's trial counsel asked to approach the bench and informed the trial court that one of the jurors, Juror Walker, was seen speaking to a witness for the State, Hampton's daughter, Minnie Fuqua. *Id.* at 63. Walker had not disclosed any relationship with Fuqua in voir dire. The parties agreed to address the issue during a break in the trial. *Id.* at 64.

During an afternoon break later that day, outside the presence of the jury, Juror Walker was brought before the trial court judge and told that the judge had been informed that Fuqua had recognized Walker or tried to say hello to him. Walker stated that he "probably knew [Fuqua] by face" and that he "probably just said hi." *Id.* at 71. The judge then asked Fuqua, who was in the courtroom, to stand up, and Walker stated that, in fact, he recognized Fuqua and that the two of them "use[d] to talk," that they had seen each other "maybe five times," and that they "used to meet each other and talk on the bus and stuff like that." *Id.* In response to questioning by the judge, Walker indicated that his friendship with Fuqua would not affect his ability to judge Fuqua's credibility, that he could listen to Fuqua testify and judge her as he would any other witness, and that he did not have any preconceived ideas of Fuqua's truthfulness. *Id.* at 71-72.

After this line of questioning, counsel approached the bench, and Petitioner's trial counsel stated that "just to be careful we should boot him," thus indicating that she

wished to remove Walker.  *Id.*  at 72.   The State did not object, and Petitioner's counsel suggested that Walker could be removed as one of the alternates.   The parties and the trial court then agreed that the trial court would reserve ruling until the end of trial.   *Id.*   After closing arguments, but before deliberations, the trial court excused Walker and asked the remaining 12 jurors to begin deliberations without Walker.   Walker therefore did not participate in jury deliberations.   *Id.* at 104.

Petitioner's Right to Testify

Before the case was submitted to the jury, and outside the presence of the jury, the trial court informed Petitioner that the State had rested its case and that Petitioner's trial counsel had indicated that she was not going to call any witnesses.   The trial court then asked Petitioner whether he understood his right to testify and whether he desired to testify.   Petitioner stated that he "guess[ed]" he did wish to testify, but then immediately said "no, I'm not going to testify."  *Id.* at 93.   The trial court then gave Petitioner time to discuss the decision with his attorney.   After a brief recess, the trial court engaged Petitioner in the following line of questioning:

> Q All right.  Mr.  Donelson, you can come back up.  After talking with Ms.  Ruess, have you had enough time to discuss with Ms.  Ruess whether or not you want to testify?
>
> A I don't.
>
> Q One question at a time.  Have you had enough time to discuss with your lawyer –
>
> A Yes.
>
> Q – whether or not you want to testify?
>
> A Yes.

Q Okay. You have had plenty of time to talk to her about that?

A Yes.

Q Now, you understand that when you make a decision as to whether or not you want to testify, it's you, Rodney Donelson, that has to make that decision. You can talk to Ms. Ruess all you want to and I think that's good. And she tells you why she thinks you might want to, why she thinks you might not want to. But in the end, it's your trial and it's come down to your decision. Do you understand that?

A Yes, Your Honor.

Q Based upon everything that you've seen happen in the trial so far, based upon your discussions with your attorney, have you come to a decision as to whether or not you want to do testify?

A No. I do not.

*Id.* at 93-94. Petitioner therefore did not testify, and his trial counsel did not call any other witnesses. At the close of evidence, Petitioner's trial counsel moved for a judgment of acquittal, which the judge denied.

Juror Questions

During deliberations, the jury submitted several written questions to the trial court. In one question, received at approximately 5:20 p.m. on the first day of deliberations, the jury asked whether jurors were "able to make a phone call since we need more time to decide?" *Id.* at 104. The trial court addressed the question with Petitioner's counsel and with the prosecutor, who both agreed that the trial court could respond that the jury "may certainly make phone calls," and could also ask the jury whether they wished to continue into the evening or come back in the morning. The trial court so responded, and the jury continued deliberating until approximately 8:00 p.m. that day. *Id.* The jury returned to continue deliberating the next morning and returned a verdict later that morning. *Id.* at

105. As noted above, the jury found Petitioner guilty of both counts of first-degree murder and both corresponding counts of armed criminal action.

The trial court record also contains a written, signed jury question asking: "Can we view the video from the 2000 crime?" Resp. Ex. B at 43. There is no indication of the date or time when the question was asked, and unlike the other written questions, there is no written response from the trial court judge. *Id.* Likewise, there is no indication in the trial transcript that the trial court addressed this question with the parties or responded to it. Resp. Ex. A.

**Direct Appeal**

On direct appeal, Petitioner, through appointed counsel, argued that the armed criminal action counts were barred by the statute of limitations and that the trial court erred in denying Petitioner's motion for judgment of acquittal on the murder counts at the close of all evidence because the State failed to prove beyond a reasonable doubt that Petitioner committed first-degree murder.[8]

The Missouri Court of Appeals agreed that the armed criminal action counts were barred by the statute and therefore reversed the trial court's judgment and vacated the corresponding sentences with respect to those counts. However, the appellate court affirmed the trial court's judgment regarding the murder counts, holding that that there

---

[8] Respondent's "Exhibit C," which Respondent asserts is a copy of Petitioner's direct appeal brief from the criminal case, is in fact a duplicate copy of Petitioner's brief on appeal from the denial of post-conviction relief. *See* ECF No. 14-3. However, a copy of Petitioner's direct appeal brief is available on Case.net, Missouri's online case management system, and the Court takes judicial notice of that public record.

was sufficient evidence for the jury to find that Petitioner was guilty of first-degree murder on both counts beyond a reasonable doubt.

## State Post-Conviction Proceedings

In his pro se motion for post-conviction relief, Petitioner asserted each of the eight grounds he asserts now in his federal habeas petition: that trial counsel was ineffective for (1) withdrawing her motion to sever; (2) failing to obtain additional DNA testing; (3) "nullifying" two "180 day Writs" that Petitioner filed with the trial court; (4) operating under a conflict of interest; (5) failing to investigate the charges, including refusing to subpoena potential alibi witnesses Christine Larue and Latoya Vanderford; (6) failing to request the removal of Juror Walker and to request a mistrial after learning that Walker had a prior relationship with witness Fuqua; and (7) advising Petitioner not to testify at trial; and that (8) the trial court judge committed judicial misconduct by allowing jurors to make unsupervised telephone calls, and by failing to respond to the jury's written request for video footage from the year 2000.

In his amended motion for post-conviction relief, filed with the assistance of counsel, Petitioner expanded upon the first, second, and seventh ineffective-assistance-of-counsel claims, relating to counsel's withdrawal of the motion to sever, failure to obtain DNA testing, and advising Petitioner not to testify, respectively. The amended motion did not incorporate any of the other claims set forth in Petitioner's pro se motion.

The motion court held an evidentiary hearing on September 13, 2013, at which Petitioner's trial counsel and Petitioner testified. On September 17, 2013, the motion court denied Petitioner's motion for post-conviction relief.

With respect to counsel's withdrawal of the motion to sever, the motion court credited trial counsel's testimony at the evidentiary hearing that she withdrew the motion because she believed that the trial court was inclined to reconsider and grant that motion, which would interfere with her trial strategy. Specifically, the motion court credited trial counsel's testimony that, because neither of the alibi witnesses she contacted had "panned out" and because she did not find Petitioner's explanation for the presence of his DNA at both crime scenes credible,[9] her best trial strategy was to argue that the DNA was not Petitioner's. The motion court credited trial counsel's testimony that she believed the best way to challenge the DNA evidence was to "compare and contrast the DNA evidence from the two murders," noting that "[t]he name on the lab report for one case did not have [Petitioner's] name spelled properly and she wanted to be able to argue it was not the correct person," and that "[t]he DNA from the other case, from the pillow case, was more likely to be a white person than a black person." Resp. Ex. G at 45-46.

Next, the motion court found that trial counsel was not ineffective for failing to obtain additional DNA testing. The motion court credited trial counsel's testimony at the evidentiary hearing that she did consult with an expert to review the DNA evidence, that the expert informed her that the laboratories the State used generally produced

---

[9] Petitioner explained the presence of his DNA in Scott's apartment to counsel by stating that, as he told police, he had been in Scott's apartment three days before her murder to fix her toilet and perhaps her VCR and that he left a bag of clothes there, including the boxer shorts. As to the Hampton crime scene, Petitioner stated that he was in Hampton's apartment a week before she died to help her turn her cable on, and in the process, he had to move the bed and was cut by something sharp on the bed, and perhaps used the rubbing alcohol to fix the cut.

accurate results, and that trial counsel was concerned that additional testing would only further confirm that the DNA belonged to Petitioner.

Finally, the motion court found that trial counsel was not ineffective for advising Petitioner not to testify at trial. The motion court relied upon Petitioner's statements under oath at trial that he had decided not to testify. Further, the motion court credited trial counsel's testimony at the evidentiary hearing that she advised Petitioner not to testify in part because Petitioner's explanation regarding the presence of his DNA at both crime scenes was not credible and would undercut her defense strategy of arguing that the DNA was not Petitioner's. The motion court also found that, in light of the evidence against Petitioner for both murders, his proposed testimony would not have been likely to persuade reasonable jurors.

The motion court did not address any of the other claims raised in Petitioner's pro se motion for post-conviction relief.

On appeal from the denial of post-conviction relief, Petitioner, through appointed counsel, pursued only the ineffective-assistance claims relating to counsel's withdrawal of the motion to sever and advice to Petitioner not to testify. Petitioner did not pursue the ineffective-assistance claim relating to the failure to obtain additional DNA testing.

In affirming the denial of post-conviction relief, the Missouri Court of Appeals noted that trial counsel "had decided her defense strategy at trial would be to compare and contrast the DNA samples taken from each of the two crime scenes," and that "[t]he name on the lab report for one case had been spelled incorrectly and the sample from the other case was determined to be more likely to have come from a Caucasian," so

"counsel's defense strategy was to argue the DNA from the murder scenes did not belong to [Petitioner]." Resp. Ex. J at 8. The appellate court held that "[b]ecause severing the offenses would have prohibited trial counsel from employing her reasonable defense strategy, withdrawing the motion to sever was not ineffective." *Id.*

As to the second claim, regarding Petitioner's right to testify, the appellate court held that the motion court was in the best position to weigh the credibility of trial counsel's and Petitioner's testimony at the evidentiary hearing, and that trial counsel's decision to advise Petitioner not to testify was "grounded in reasonable trial strategy." *Id.* at 9-10.

## Federal Habeas Petition

As indicated above, Petitioner raises eight grounds for federal habeas relief. Petitioner asserts that trial counsel was ineffective for (1) withdrawing her motion to sever, (2) failing to obtain additional DNA testing, (3) "nullifying" two "180 day Writs" that Petitioner filed with the trial court, (4) operating under a conflict of interest, (5) failing to investigate the charges and to subpoena alibi witnesses Larue and Vanderford, (6) failing to request the removal of Juror Walker or a mistrial as a result of Walker's bias, and (7) advising Petitioner not to testify at trial. Petitioner also asserts that (8) the trial court judge committed judicial misconduct by allowing jurors to make unsupervised telephone calls, and by failing to respond to the jury's request for video footage from the year 2000, and trial counsel was ineffective for failing to object to the judge's conduct.

With respect to most of these claims (Grounds 1, 2, 4, 5, and 6), Petitioner also asserts that he requested that direct appeal counsel assert the claims on direct appeal, and

she failed to do so, but that Petitioner "preserved [the] issue" in his motion for post-conviction relief.   ECF No. 1 at 6-10.

Respondent argues that the petition is untimely and was filed one day after the statute of limitations expired under 28 U.S.C. § 2244(d).   Further, Respondent argues that Grounds 2 through 6, and 8, have been procedurally defaulted, and that all of the claims are without merit.   Petitioner did not file a traverse.

## DISCUSSION

### Statute of Limitations

As an initial matter, the Court rejects Respondent's statute-of-limitations argument, which appears to be based on several miscalculations.[10]   The Court's own review suggests that the petition is timely.

### Legal Standard

Federal habeas relief is available to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."   28 U.S.C. § 2254(a).   Where a claim has been adjudicated on the merits in state court, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that habeas relief cannot be granted unless the state court's adjudication:

---

[10]   For example, Respondent asserts that Petitioner's "direct appeal was completed on July 28, 2011, fifteen days after the appellate opinion" (ECF No. 14 at 7), but as noted above, the appellate opinion was issued on July 5, 2011, so 15 days later would only be July 20, 2011.   Respondent further asserts that "[t]he postconviction appeal ended on June 4, 2015 when the Missouri Court of Appeals issued its mandate," and that Petitioner's "petition indicates he placed it in the prison mail system 352 days later on April 28, 2016."   *Id.*   But the number of days between June 4, 2015 and April 28, 2016 is only 329, not 352.

1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to show ineffective assistance of counsel, "a [petitioner] must show that counsel's performance was deficient," and "that the deficient performance prejudiced [his] defense." *Id.* at 687. When "[c]onsidering an attorney's performance, [the court] must indulge a strong presumption that the conduct was reasonable, and the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Paulson v. Newton Corr. Facility*, 773 F.3d 901, 904 (8th Cir. 2014) (citation omitted). In other words, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *White v. Dingle*, 757 F.3d 750, 752 (8th Cir. 2014) (citation omitted). In order to show prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 753 (citations omitted).

When addressing claims that were addressed by state courts, "[t]aken together, AEDPA and *Strickland* establish a doubly deferential standard of review." *Williams v.*

*Roper*, 695 F.3d 825, 831 (8th Cir. 2012) (citation omitted). It is not sufficient for a petitioner to "show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance." *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). "Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Id*. at 699.

## Ground 1: Withdrawal of Motion to Sever

A close question is presented as to whether Petitioner's trial counsel was ineffective for withdrawing the motion to sever. The state court credited trial counsel's explanation at the post-conviction evidentiary hearing that the decision to withdraw the motion to sever was a matter of trial strategy—namely, a strategy to keep the murder charges joined so that she could "compare and contrast" the DNA evidence in an attempt to argue the DNA did not belong to Petitioner.

Trial counsel's explanation is troubling. As an initial matter, Petitioner admitted to being in both apartments and provided at least some explanation of the presence of his DNA there. But even if trial counsel believed the best strategy was to argue that the DNA did not belong to Petitioner, it is not clear to the Court why she needed to join the murder charges to do so.

From the Court's review, trial counsel never actually "compar[ed] or contrast[ed]" the DNA evidence from the two crime scenes at trial. Rather, her discussion of the DNA evidence at trial consisted of arguing that some of the DNA evidence in Hampton's case (but not in Scott's case) may have belonged to an unknown white man named Rodney Donaldson, rather than Petitioner, and stating in closing argument that "nobody" had

compared the DNA from the two cases. In other words, trial counsel's challenge to the DNA evidence focused on Hampton's case alone and whatever conclusion the jury might draw from a lack of comparison between the DNA samples in the two cases.[11]

The Court is hard pressed to find that reasonably competent trial counsel under the same or similar circumstances would have waived a challenge to joining the murder charges. And, given the significant differences between the crimes, the trial court may well have reconsidered and granted the motion to sever had it not been withdrawn.[12] Counsel apparently anticipated such a result. Counsel also at one point acknowledged the "overwhelming" prejudice resulting from joining the murder charges. Had the charges been severed, the outcome of trial might possibly have been different.

But despite its significant concerns, the Court cannot say that the state court's adjudication of this claim was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Rather, under the "doubly deferential" standard of review, the Court "must give the [state] Court of Appeals the benefit of the doubt unless [the petitioner] makes a showing that its ruling was so lacking in justification that there is an error well understood and comprehended in

---

[11]    In this respect, the state court's suggestion that name-error was in one case, and the race issue (Caucasian versus African-American) was in the other, *see* Resp. Ex. J. at 8, appears to be a mischaracterization of the evidence at trial.

[12]    Even if the trial court did not reconsider its decision, absent withdrawal, the issue would have been preserved for appeal.

existing law beyond any possibility for fairminded disagreement." *Fenstermaker v. Halvorson*, 920 F.3d 536, 540 (8th Cir. 2019) (citing *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  Petitioner has not made such a showing.

Counsel was faced with a difficult task, given the evidence against Petitioner in both murders.  And this Court "must resist the temptation to second-guess [counsel's] trial strategy," even if that strategy later proved to have been unsound.  *See Blackmon v. White*, 825 F.2d 1263, 1265 (8th Cir. 1987); *see also Flowers v. Norris,* 585 F.3d 413, 417 (8th Cir. 2009) (holding that it is inappropriate for a federal habeas court to "second-guess" trial counsel's strategic decision not to seek to sever charges).  Given this standard, the Court concludes that Petitioner has not shown that counsel's choice to try the charges together so clearly outweighed her alternative options that it was objectively unreasonable for the state court to find that counsel acted within the "wide range" of reasonable professional assistance under *Strickland*.  The Court will therefore deny habeas relief on this ground.

### Ground 7: Advising Petitioner Not to Testify

Petitioner's Ground 7 implicates two constitutional rights—the right to effective assistance of defense counsel, and the right of a criminal defendant to testify in his own defense.  Only the defendant may waive his right to testify, and the waiver of this fundamental constitutional guarantee must be knowing and voluntary.  *Frey v. Schuetzle,* 151 F.3d 893, 898 (8th Cir. 1998).

To the extent Petitioner is asserting that he did not knowingly and voluntarily waive his right to testify, the state court correctly held that such claim is defeated by

Petitioner's representations to the trial court that he understood the decision to testify was his own, regardless of his counsel's advice, and that he had decided not to testify. *See United States v. Orr,* 636 F.3d 944, 955 (8th Cir. 2011 ) (rejecting claim that counsel was coerced the defendant not to testify where the court engaged defendant in elaborate discussion regarding his right to testify, and the defendant knowingly waived that right).

As to trial counsel's advice not to testify, such advice is not ineffective assistance if it might be considered sound trial strategy. *Lee v. United States*, No. 4:17 CV 779 CDP, 2018 WL 5266594, at *4 (E.D. Mo. Oct. 23, 2018). This again presents a close question. But for the reasons discussed above, given the highly deferential standard of review and the wide range of constitutionally acceptable assistance under *Strickland*, the Court cannot say that the state court's adjudication that trial counsel's advice to Petitioner was a matter of sound trial strategy was objectively unreasonable. *Smith v. Jones*, 923 F.2d 588, 590 (8th Cir. 1991) (denying habeas claim arising out of advice not to testify in light of the state court's finding that counsel's decision was a matter of trial strategy). This is especially so given Petitioner's numerous conflicting statements.

## Procedurally Defaulted Claims (Grounds 2-6 and 8)

Under the doctrine of procedural default, a federal habeas court is barred from considering the merits of a claim not fairly presented to the state courts, absent a showing by the petitioner of cause for the default and prejudice resulting therefrom, or that he is actually innocent, such that a miscarriage of justice would result by failing to consider the claim. *E.g., Murphy v. King*, 652 F.3d 845, 848-49 (8th Cir. 2011). The Court agrees

with the State that Petitioner's Grounds 2 through 6, and 8, were procedurally defaulted in state court.

Although Petitioner raised all of his federal habeas ineffective-assistance-of-counsel claims in his pro se motion for post-conviction relief, he abandoned Grounds 3 through 6 by leaving them out of the amended motion for post-conviction relief. *See Ivy v. Cassady*, No. 4:13-CV-01283-JAR, 2016 WL 5371576, at \*5 (E.D. Mo. Sept. 26, 2016). And although he raised Ground 2 in the amended motion for post-conviction relief, he did not pursue that claim on appeal from the denial of that motion. In Missouri, "a claim [must] be presented 'at each step of the judicial process' in order to avoid default." *Jolly v. Gammon,* 28 F.3d 51, 53 (8th Cir. 1994) (quoting *Benson v. State*, 611 S.W.2d 538, 541 (Mo. Ct. App. 1980)). "Failure to raise a claim on appeal from the denial of a post-conviction motion erects a procedural bar to federal habeas review." *Id.*

Likewise, Petitioner's Ground 8, alleging judicial misconduct in handling jury questions, could and should have been raised on direct appeal. The failure to do so constituted procedural default. To the extent Petitioner is asserting that trial counsel was ineffective for failing to object to the trial court's conduct, such a claim was also defaulted because it was not raised in the state post-conviction proceeding.

The ineffective assistance of post-conviction counsel "may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial" where "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez v. Ryan*, 566 U.S. 1, 14 (2012). Although Petitioner has not explicitly relied on *Martinez* or

argued any other cause exists to excuse the default, the Court has considered whether post-conviction counsel's failure to raise Grounds 3 through 6—and 8, to the extent it asserts ineffective assistance of trial counsel[13]—should excuse the default of these claims. In doing so, the Court has considered the merits of these claims, discussed further below, and determined that they are not substantial and, therefore, are not saved by *Martinez*.

But the Court has not considered, and will not consider, whether *Martinez* can save Ground 2, alleging ineffective assistance for failing to obtain additional DNA testing. *Martinez* has been construed narrowly, applying only to a single type of claim— substantial claims of ineffective assistance of trial counsel—in a single context—when the procedural default occurs during an initial postconviction proceeding by which such claims must be raised under state law. *See Davila v. Davis*, 137 S. Ct. 2058, 2062 (2017). A federal habeas petitioner cannot rely on *Martinez* to excuse a procedural default arising out of the failure to preserve a claim on appeal from a postconviction proceeding. *Arnold v. Dormire*, 675 F.3d 1082, 1087 (8th Cir. 2012). Thus, Petitioner cannot rely on *Martinez* to excuse his default of Ground 2 because that claim, although raised in his amended motion for postconviction relief, was not preserved on appeal from the denial of

---

[13]     The Supreme Court has declined to extend the holding of *Martinez* to a claim of ineffective assistance of direct appeal counsel. *See Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017). Therefore, *Martinez* cannot save Ground 8's judicial misconduct claim, even if Petitioner were to assert that direct appeal counsel was ineffective for failing to raise that claim on direct appeal. Further, Petitioner's assertion that direct appeal counsel refused to assert his other claims—all of which are ineffective-assistance claims—on direct appeal is irrelevant because, in Missouri, such claims must be asserted in post-conviction proceedings rather than on direct appeal. *See* Mo. Sup. Ct. R. 29.15(a).

that motion.  As Petitioner has asserted no other cause, and has not asserted actual

innocence, the Court will deny Ground 2 as procedurally defaulted.

Ground 3: "Nullifying" Petitioner's "180 day Writs"

Petitioner's Ground 3, although lacking any detail as to what actions trial counsel

took or how they prejudiced Petitioner, appears to be based on an alleged violation of

state law.  As Respondent notes, under Missouri state law, "if [a] prisoner properly

invokes the Uniform Mandatory Disposition of Detainers Law ("UMDDL"), [Mo. Rev.

Stat.] §§ 217.450–.485, he must be brought to trial within 180 days after receipt of the

request and certificate pursuant to section 217.450 and section 217.455 by the court and

the prosecuting attorney or within such additional necessary or reasonable time as the

court may grant."  *See State v. Williams*, 120 S.W.3d 294, 298 (Mo. Ct. App. 2003).  But

any claim based on violation of the UMDDL is not cognizable in a federal habeas

petition.  *See Taylor v. Steele*, 372 F. Supp. 3d 800, 817 (E.D. Mo. 2019) (citing *Poe v.

Caspari*, 39 F.3d 204, 207 (8th Cir. 1994)).

To the extent that Petitioner is asserting a claim of ineffective assistance based on

counsel's alleged blocking of, or failure to pursue, dismissal for violation of the

UMDDL, Petitioner must demonstrate that, had counsel sought such a dismissal, it would

have been granted.  *See Giammanco v. Wallace*, No. 4:14 CV 1739 CDP, 2018 WL

3219652, at *7 (E.D. Mo. July 2, 2018), appeal dismissed, No. 18-2689, 2018 WL

7203235 (8th Cir. Dec. 21, 2018).  The Court agrees with Respondent that Petitioner has

not explained why a motion to dismiss for violation of the state speedy-trial rule would

have been successful.  Ground 3 is therefore without merit.

<u>Grounds 4 and 5: Conflict of Interest and Investigation of Charges / Alibis</u>

Regarding Ground 4, Petitioner offers little explanation of counsel's alleged "conflict of interest" aside from asserting that counsel had an "agreement with prosecution" not to file motions to suppress. ECF No. 1 at 8. But Petitioner has not explained what legal basis existed to file such a motion or what prejudice resulted from failing to file one. Likewise, as to Ground 5, Petitioner has not explained what additional investigation would have revealed or what the purported alibi witnesses would have said; nor has he demonstrated that additional investigation or witness testimony would have affected the outcome of trial, so as to demonstrate prejudice. In short, Petitioner's conclusory allegations in Grounds 4 and 5 are insufficient to prove ineffective assistance of counsel. *See, e.g.*, *Bryson v. United States*, 268 F.3d 560, 562 (8th Cir. 2001).

<u>Ground 6: Removal of Juror Walker</u>

Petitioner's Ground 6 asserts that counsel was ineffective for failing to request the removal of Juror Walker or to request a mistrial after learning of Walker's association with Hampton's daughter, Fuqua. To prevail on a claim of ineffective assistance of counsel based on trial counsel's failure to strike a biased juror, a habeas petitioner must show that the juror was actually biased against him. *Goeders v. Hundley,* 59 F.3d 73, 75 (8th Cir. 1995) (citation omitted). Petitioner has not made this showing.

Contrary to Petitioner's assertion, the record reflects that counsel did request the removal of Walker and that Walker was in fact removed before deliberations. Moreover, counsel informed the trial court of the issue as soon as she learned of it, the trial court promptly inquired into the issue, Walker stated that his relationship with Fuqua was

limited to a few conversations, and Walker clearly stated that the relationship would not affect his ability to judge the evidence. Petitioner has not shown actual bias.

Even if he had, he cannot demonstrate prejudice because Walker did not assist in deliberations and there is no evidence that his presence tainted or had any other effect on the jurors that did deliberate. *See, e.g.*, *Lang v. Bobby*, 889 F.3d 803, 812 (6th Cir. 2018) (affirming the denial of habeas relief based on the presence of a juror who had a previously-undisclosed familial connection with victim but who was removed prior to deliberations, where the petitioner presented no evidence that the juror was actually biased against him or that the remaining jurors were tainted by his presence); *United States v. Fletcher*, 634 F.3d 395, 409 (7th Cir. 2011), *as amended* (Feb. 23, 2011) ("Fletcher cannot demonstrate prejudice from the alternate juror's mere presence at his trial. She did not assist in deliberations or deciding the case, and Fletcher has presented nothing to substantiate his claim that her very presence 'tainted' the verdict.").

Ground 8: Trial Court's Handling of Juror Questions

Petitioner's final claim—that trial counsel was ineffective for failing to object to the judge allowing jurors to make unsupervised telephone calls and failing to object to the judge's lack of response to the jury request for video footage—is likewise without merit. Petitioner has not shown that his counsel's conduct in this regard was unreasonable, or that it affected the outcome of trial.

As to the telephone calls, although due process guarantees the right to a trial by an impartial jury, it "does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S. Ct.

940, 946, 71 L. Ed. 2d 78 (1982). The record reflects that the judge repeatedly instructed the jury not to discuss the case with others, and Petitioner has presented no evidence that any juror failed to follow this instruction. *See, e.g.*, *Kirk v. King*, No. 3:16-CV-95-DPJ-MTP, 2018 WL 3332450, at *10 (S.D. Miss. Feb. 15, 2018), *report and recommendation adopted,* No. 3:16-CV-95-DPJ-MTP, 2018 WL 1997525 (S.D. Miss. Apr. 27, 2018) (denying habeas relief on claim alleging that trial judge allowed jurors to make telephone calls where there was no evidence any juror was subjected to inappropriate influences or biased). Regarding the jury request for video footage, although it does not appear that the trial court responded to this question, Petitioner has not explained what the video entailed or how it would have altered the verdict, so as to demonstrate prejudice under *Strickland*.

In sum, the ineffective-assistance-of-counsel claims in Grounds 3 through 6, and 8, are denied as procedurally defaulted and without merit.

## CONCLUSION

For the reasons discussed above, Petitioner is not entitled to federal habeas relief. The Court has also considered whether to issue a certificate of appealability in this matter under 28 U.S.C. § 2253(c). To grant such a certificate, the Court must first find a substantial showing of the denial of a federal constitutional right. *See Tiedeman v. Benson*, 122 F.3d 518, 522 (8th Cir. 1997). A substantial showing is "a showing that issues are debatable among reasonable jurists, [that] a court could resolve the issues differently, or [that] the issues deserve further proceedings." *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir. 1997) (citing *Flieger v. Delo*, 16 F.3d 878, 882-83 (8th Cir. 1994) ).

Upon a final review of Petitioner's claims, the Court concludes that reasonable jurists would find the Court's assessment of Petitioner's claim of ineffective assistance of counsel for withdrawing the motion to sever (Ground 1) debatable.  Thus, the Court will issue Petitioner a Certificate of Appealability under 28 U.S.C. § 2253(c) with respect to this claim only.  The Court does not believe a Certificate of Appealability is warranted on any other claims.

Accordingly,

**IT IS HEREBY ORDERED** that the petition of Rodney L. Donelson for a writ of habeas corpus relief is **DENIED**.

**IT IS FURTHER ORDERED** that the Court will issue a Certificate of Appealability in a separate document.

A separate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G.  FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 30th day of September, 2019.